Our next case is 415-0871, People v. Jeremy Stevens. For the appellant is Brian Wilson. For the appellee is John Zimmerman. Mr. Wilson, you may proceed, sir. May it please the Court? Counsel. Counsel. Good morning, Your Honors. I represent Jeremy Stevens on behalf of the Office of the State Appellant Defender. In Moore v. Madigan, the Seventh Circuit ruled that the right to bear arms extended outside of a person's home. Arguably in response to that precedent, the Illinois General Assembly passed the Illinois Firearm Concealed Carry Act, which provided for regulations allowing a person to carry a concealed firearm outside of their home or property. The Act requires that anyone who wishes to carry a loaded, uncased, and immediately accessible firearm receive training as well as a license. The Act also provided a funding source for the implementation of the Act's provisions. Jeremy Stevens was convicted of aggravated unlawful use of a firearm because he was found in possession of a loaded, uncased, immediately accessible firearm and, according to the State, did not possess a valid license to carry a concealed firearm pursuant to the Act. He's argued that the Act is unconstitutional and, as a result, his conviction, based on his failure to possess the requisite license, should be vacated. A State is able to regulate the exercise of a constitutional right. But where the State elects to do that by imposing a fee, the fee must be nominal and it must be used to defray and cannot exceed the administrative costs of regulating the constitutional activity. Some of the fees imposed by the Act in this case violate this fundamental tenet of constitutional law. If an Illinois citizen wants to carry a concealed firearm, they first must pay a $150 fee. For out-of-state residents, it's a $300 fee. And those payments are broken up, then, into three separate funds. The State Police Firearm Service Fund, the Mental Health Reporting Fund, and the Crime Laboratory Fund. The portion of the fee placed in the Crime Laboratory Fund has absolutely nothing to do with the licensure or the regulation of citizens who wish to carry a concealed firearm outside of their residence. How much of that $150 goes to that particular fund? It's $10. Does that make a difference? It doesn't. Is that rather de minimis? It is in terms of the money that you're looking at. It's also spread over five years. I'm not sure if the $150 fee is spread out over five years. Actually, it is. It is spread out over five years. That's accurate. But in Murdoch, the court said there is no de minimis exception here. It doesn't matter if the fee is so small that it doesn't prohibit the exercise of the constitutional activity. But the cases, whether we're looking at Murdoch or the Quan or the Kanady case, they look at, are all of the funds that are collected when regulating a constitutional activity, is all of that money spent solely for the purpose of regulating that activity? And if it's not, the provision of the statute is unconstitutional. This is your burden, right? Correct. So what evidence do you have with regard to the application of the fee? I guess I don't understand your question. Well, you're the one who has to establish that the fees aren't being appropriately spent. Right. What evidence do you have? So there are two different examples of the fees not being spent accordingly that are in the briefs. The first is the fee that's placed into the State Crime Laboratory Fund. That fund has nothing to do with the licensure or regulation of someone who decides to carry a concealed firearm. Those funds in the statute that you cite, if the fees may be included, may be used to do the following. Not exclusive, not exclusive. Cost incurred in providing analyses of controlled substances in connection with criminal investigations, purchase and maintenance of equipment for use in performing analyses, continuing education, training, and professional development of forensic scientists regularly employed by these departments, these laboratories. Wasn't the crime lab used in this case? Not that I'm aware of as far as the crime lab being used in this case. Yes. Both in the statute. Didn't the trooper indicate that the gun had been sent off for functionality tests, which then ultimately that lab report showed up just before the trial? The gun was sent away for functionality tests. Now, there's no indication in the record that I'm aware of that it went to the specific crime lab here. Well, who else does it go to? It could have gone to the Illinois State Police Crime Lab versus the… This is the State Crime Lab Fund. Well, this is for the Department of State Police and the Department of Human Services, which wouldn't have the ability or the jurisdiction to do the tests on firearms functionality tests and the sort. What evidence do you have of that? I'm sorry? What evidence do you have of that? There's nothing in the briefs that indicate anything regarding the firearm here. There's no evidence that I'm aware of that the firearm was sent to the lab at issue in the case that receives these funds as well. The relevant statute and the state even in their brief notes… How would you be likely to establish someone in possession of a firearm actually had a firearm in their possession if they're not seen with the gun? Well, you're talking about actual possession? Sure. Fingerprints, DNA, things of that nature. But none of that was done here that I'm aware of. It doesn't have to be in this case.  No, it doesn't have to be in Jeremy's case. Your claim is a facial unconstitutionality. Correct. Not as implied. Correct. But the statute, even the state acknowledges that this portion of the fee is not linked to the Illinois Firearm Concealed Carry Act, the portion of the fee that we're challenging here in the statute. It goes on to say that the state crime laboratory fund is used to offset the explosive connection with criminal investigations. So the state has acknowledged that it has no bearing here in the Insta case as well. You cited at the beginning of the argument, if I understand you correctly, some decision of the Southern Circuit that you thought was supportive? Just the Moore v. Madigan case. You had the Heller case and the McDonald case that talked about possession of a firearm inside of the home, and Moore v. Madigan was the one to say you also have that right outside of the home as well. Is my understanding correct that your argument appears to be that the constitutionality of a fee for a government service depends on proof of an exact equality between the cost of the service and the size of the fee? Put another way, yes. I would agree with that. Well, the reason I mention that is here's a quote from the Seventh Circuit, July 1, 2014, Marca Donato's v. Village Woodridge, in which at issue was the constitutionality of that village requiring people to pay and this is what the Seventh Circuit wrote. There's no contention that for the same service provided by the village, a fee of $30 is excessive. The county study suggests, if anything, that the fee doesn't cover the village's cost. Anyway, the constitutionality of a fee for a government service does not depend on proof of an exact equality between the cost of the service and the size of the fee. That's a statement from the Seventh Circuit specifically rejecting the proposition that you just accepted, and I appreciate your candor in doing so, that you're asserting to this court. So the difference I see there is one that was discussed in the Quong v. Bloomberg case, where they had an analysis of the equalities of the fee. And in Quong, the case looked at the fees that were submitted for the licensure requirement versus the amount that it took to fund the various programs that regulated the possession of the firearms. And they found that there was no equality in that case, but that because there was no, the fund, the amount that the folks paid to possess a firearm was less per capita than what the cost was for the state to maintain the databases and the background check and everything. So in that sense, the fact that there's no equality isn't a material factor in the analysis. Where you're looking at whether the fund is used for the purposes that the person submits the fee for, which was what was looked at in the Murdoch case and in the Quong case and in another one, which it's a free speech case, but the Kennedy case. What they look at is, was there anything that the state did with the funds or with the regulation that went over and above what the stated purpose was? And that's the analysis in the instant case. Well, but it seems to me, going back to the very first question that Justice Sterner asked about the minimus, this is a, it would be a different case if it was a $5,000 fee as opposed to maybe 10 bucks or whatever spread over five years. And then we're talking about the Seventh Circuit that complements that idea, that the constitutionality of fee for government services did not depend on proof of an exact equality between the cost of the service and the size of the fee. If it were $5,000, we wouldn't be worrying about the exact equality. And we're talking about a few bucks here or there. It seems to me that that's a pretty thin reed upon which to hoist a claim of facial unconstitutionality. Well, in the Murdoch case, we were even looking at as little as $1.20. And they did the same analysis there over $1.20. So, again, it's not so much whether there's a de minimis exception to this. It's the idea that if somebody- Murdoch was 1943? Correct. Well, this is 2014 from the Seventh Circuit that they just missed that case? Well, Murdoch was a, I don't know, Murdoch was a U.S. Supreme Court case. And I obviously haven't read the case that you're citing. And I would like to reserve the opportunity to file a supplemental brief once I have an opportunity to- Sure, go ahead. I'll give you the citation. It's 760 F3rd 545. All right. Thank you. But then we have an additional problem with this statute, which is the funds are not only sent to the Fire and Concealed Carry Act spent for that purpose, but they're also merged in with a pool of money spent for the Illinois FOID program, which in Illinois, if you wish to carry a concealed firearm, you have to have a FOID card. But not everyone with a FOID card carries a concealed firearm. Why does that matter? Well, it matters because it is a- if I wanted to carry a concealed firearm- You have to get a FOID card. Right. I would have to get a FOID card. One is a condition proceeding to the other. Correct. But the fact that they don't necessarily work both ways isn't even relevant to a constitutional- And I disagree with that. And the reason I disagree with that is- let me give you a hypothetical. I have a FOID card. I personally have a FOID card. If I wanted to get a concealed and carry card, a card to exert a Second Amendment right that the federal court has said I have to exercise, and I go- It also said states can regulate. Correct. But if I go and I say, I would really like to get a concealed carry license, and they say, okay, you can have your concealed carry license when you pay $10 for a FOID card. Well, I've already got my FOID card. Well, we need $10 to help pay for the FOID card program. They're not allowed to do that. That's not the situation. But it actually seems like it is because the money that is paid by applicants who get licenses to carry concealed firearms is pooled in the state police services fund and the mental health reporting fund with money from the FOID card act. Cox, which you cite, says, such a fee- and you quote this- Such a fee is lawful if it is instead designed to meet the expense incident to the administration of the act and to the maintenance of public order in the matter license. What is there about FOID cards and concealed carry licenses that don't both relate to the public order of the matter license? The possession and carrying of a firearm. Sure. Once I, in my hypothetical that I gave a moment ago, once I already have my FOID card, I shouldn't have to pay additional fees to help other people get FOID cards or for administration of the FOID card act. I've already paid that amount. So you can't charge me. It would be like if I wanted to carry a concealed firearm and they said, you know what, you can as long as you pay $50 that goes towards corn research to ensure that we're raising the best hybrids in the state of Illinois. You can't do that. The money that you pay for the privilege of exercising a constitutional right has to be money that goes towards the expense of regulating that constitutional right, my right to carry a firearm outside of the home. Can't go to these other causes that Illinois may very well want to support. What other cause that's unrelated to concealed carry, possession of firearms, the lawful possession of firearms, does this money go to? Well, I'm talking about the FOID act, the FOID card act. Because, again, the problem you run into is... We're not attacking the FOID card act. Well, no, but I'm trying to answer the question that you earlier posed. There's a difference between paying X amount of dollars for the privilege of carrying a concealed firearm and paying X amount of dollars for the privilege of carrying a concealed firearm and paying a subsidy or subsidizing the FOID card program. Well, and as both the FOID card act and the concealed carry act acknowledge, the existence of concealed carry puts additional burdens on FOID applications, FOID research, FOID investigations. That's all relevant to the concealed carry statute. Well, because don't they have to... FOID doesn't have to go look anywhere to see if somebody has a FOID card. They have that information. Right. Concealed carry has to go to determine whether, in fact, you have a FOID card. So that's an additional obligation that doesn't exist in the FOID act. So the FOID statute fee, the $10 fee doesn't go to that. The $10 fee in your example that goes from concealed carry to FOID is because there are now additional duties and responsibilities required by the concealed carry act that mandate they investigate FOID applications. And that's not the way I read the statute. The statute talks about the concealed carry. The fee that you pay for the concealed carry goes towards background checks, things of that nature. That goes into the state police services fund. And then you have the FOID act, which is an entirely separate piece of legislation that that money is pooled with, and then jointly it's spent on concealed carry and FOID. I guess my argument is they're commingling the money in a single fund, which doesn't fulfill the purposes of solely the concealed carry act. Aren't they set up in two specific separate funds? There are two separate funds, but the money is pooled into both of those funds under the provisions of the statute. So it's for these reasons that we've made the argument that Jeremy's conviction should be vacated because he has the right to carry a concealed firearm as set forth in Moore v. Madigan. And that right requires him to pay a fee that goes towards these functions that are unrelated to concealed and carry. So for that reason, the – I still haven't heard you talk about – I haven't heard you identify any function that isn't related to concealed and carry. Well, we have the State Crime Laboratory Fund that I talked about a moment ago. And then we have the FOID card. What gun case doesn't go to the crime lab? Oh, I've had cases that haven't gone to the crime lab. Well, yeah, I mean, if you already know that the guy possessed the gun or fired the gun. But ballistics, DNA, GSR, fingerprints, all of that involves the crime lab. And all of those are related to gun possession or use charges. I just don't know that it was used in this case. And on a facial challenge, the issue is could it have? Because if we can conceive of any circumstance where it could have and it's utilized, you lose. I'm just not sure that the record is clear that it could have. We don't need the record to have shown it in this case. It doesn't have to be could have in this case. It could have under any set of circumstances, isn't that the analysis? Under a facial challenge. Yeah. Yeah. But before my time expires, I'd like to turn to the ineffective assistance of counsel. I'll do that very quickly. While I was preparing for this argument, I learned that Jeremy completed his probationary sentence after the initial brief was filed. Thus, if this court were to view the ineffective assistance of counsel argument and conclude that the record wasn't fully developed, there's no longer an available remedy of saying, let's save this for a post-conviction petition. He is unable to file that at this time. As soon as I learned that, I contacted the state to let them know that I was planning on filing a supplemental brief, asking for a lesser alternative remedy, which would be remanding this case to the circuit court to have a hearing into the ineffective assistance of counsel claims I've raised in this brief. Now, obviously, that's only if this court believes that there's not a sufficient record developed to justify reversal. Again, counsel, thank you for your candor. I think that's a professional way to handle it, and good for you. But as far as the ineffective assistance of counsel claims, this certainly seems like a case where counsel completely dropped the ball. We have a defense attorney who- Again, stopping right there for the moment, had counsel made objections and not engaged in the content where you talk about counsel dropping the ball, say, I object to this. I want to hear some testimony about all this. I object to the certificate. I object to it all. What would have happened? Do you mind if I answer the question? Please go ahead. Defense counsel could have then pursued other alternative theories in this case. For example, he could have challenged the inadmissible testimonial hearsay document that was admitted that he initially objected to on relevancy grounds. But shifting, shifting, this is a serious trial going on here, and you're the prosecutor. We'll change hats for you here in a moment. The defense attorney says, I'm going to be objecting to all this. So you bring out this testimony. How is this any different, for instance, than agreeing to the results from a lab and a drug case? Well, because we know that defense counsel initially objected to it. He tried to keep the Illinois State Police Firearm Services Bureau document out of evidence. He objected to it on relevancy grounds. So it's not a situation where he was stipulating to it or he had an agreement with the state that it could be admitted. He objected to it. He tried to keep it out. The problem was he didn't keep it out or he didn't object to it on the proper grounds. He apparently didn't realize that it was nothing but testimonial hearsay and it should have been excluded for those reasons. But it said, yeah, it's okay because I know the state can call someone to testify about all this if needed. We don't have that in the record, though. But that would have been okay. It could. That's a different case. I'd have to look at the record in that case to see what argument I'd be making. But certainly we don't have that evidence here in the record. And, again, he tried to keep it out and he failed in that regard. Okay. Thank you, counsel. Thank you. Mr. Zimmerman? May it please the Court? Counsel. Counsel. Good morning, Your Honors. My name is John Zimmerman. I'm from the Fourth District Appellate Prosecutor's Office here on behalf of the state. I'll be relatively brief based on the discussion I just heard between Your Honors and counsel. The state's position is that the fees required by the Concealed Carry Act are constitutional. The fees are nominal. It's only $30 every year for a total of $150 every five years. And they're imposed as a regulatory measure to defray the expenses of policing or regulating the activities in question and as well as enforcing and protecting the public as well as public order. The purpose of this act is to promote public safety, prevent crime, allow only law-abiding citizens to conceal and carry a firearm. Clearly this act and the fees required by it are constitutional. Like I said, they're nominal. And they are utilized to regulate and police the activities that are in question underneath this act. As Justice DeArmond was saying, all of these funds are utilized in enforcing and policing this act. How is the State Crime Laboratory Fund used to enforce the act? It's utilized, as Justice DeArmond said, to offset costs of investigation into certain crimes. Well, that seems general to me. How does it affect this particular act? With firearms involved, there's always gunshot residue. Whether the firearm is actually functioning as a firearm. It could just be, you know, a gun with an optical barrel that can't actually shoot, so therefore it's not actually a firearm. It could be all those things. What does that have to do with getting a concealed carry permit? Well, can you rephrase that question? I'm trying to see what your nexus is between a ballistic test versus whether someone qualifies to get a concealed carry permit. That's my question. What's the tie-in there? The tie-in is that it's all regulation of firearms in Illinois and regulating who can possess firearms in a concealed carry manner. In a case such as this, where there was a firearm involved, it was sent off to the lab, and so this was likely utilized. And there's likely many other cases where this is. In this case, it was sent to the lab. Is that what you said? Yes. I'm sorry. Yes, Your Honor. For what reason? Off the top of my head, I do not remember the exact reason. I'm sure to make sure it was a proper functionality of the firearm. It was reported a couple days before trial that nobody was aware of. And so without that test and the functionality test, the State would not have been in a position to determine whether the defendant had a concealed carry permit? Am I following this? I'm not trying to confuse you. Yes. Just that I'm confused. Well, to prove that he violated the law, that it had to have been a firearm. So the fact that somebody has a concealed carry permit doesn't necessarily mean they're going to lawfully use the weapon they have. Yes, that is correct. So I think I understand your line of questioning. Since he violated the aggravated unlawful use of a weapon, one of the requirements was that he did not have a concealed carry permit. And these fees of regulating this Concealed Carry Act go to help enforcing and promoting and protecting the public as well as the activities in question that the Concealed Carry Act was designed to do. Which, as I stated, it was designed to promote public safety. You know, you don't want people with a crazy temperament to be able to possess a concealed carry gun. So an example of that, that's why some of these funds go to the Mental Health Reporting Fund, because there's people who are not mentally fit to possess a concealed carry gun. As Justice DeArmond stated, it goes to the State Crime Lab Fund, because often firearms are utilized in crimes. And, again, that was a regulatory – these are regulatory fees designed to defray the expenses of policing or regulating the activities in question, which is the concealed carry of guns, and those who do not legally do so under the Act. Counsel also stated that the State conceded – Could it be even broader than just the concealed carry? Can I go back to that language from Cox, where they talk about the fee has to meet the expense incident to the administration of the Act and to the maintenance of public order in the matter license. Matter license is possession and use of firearms. A much broader topic than just concealed carry. Yes, Your Honor. The State agrees with that. And Counsel did state that the fee – or the State conceded that this State Crime Lab Fund was not explicitly tied to the Concealed Carry Act, but that is just because of the statutory language within this lab fund. So the State Police Services Fund and the Mental Health Reporting Fund both explicitly reference the Concealed Carry Act within it, whereas the State Crime Lab does not. But we're not conceding that it's still not involved with the Concealed Carry Act. In fact, as Justice DeArmond has been stating quite frequently, it's still involved in the regulation of firearms. So the absence of that language is irrelevant, then? Yes, for the purpose of the State Crime Lab Fund. I was merely stating that in regards to the two other funds to show that it was explicitly referenced. So there's no question as to whether those were explicitly tied. Whereas the State Crime Lab Fund, yes, there was no explicit link. But if you look at the overall large picture, that it's still related to policing and regulating the activities in question, which is the control of firearms in Illinois. The State also contends that the fees survive intermediate scrutiny, as Illinois has a substantial and legitimate interest in ensuring the safety of the general public from individuals who don't have the essential temperament that should be present and one entrusted with a dangerous weapon. And that these fees are substantially related to Illinois' interest of promoting public safety and preventing gun violence. In regards to the severability, the State will rest on its brief on that, because as the statute is constitutional, there's no purpose to discuss that. Also, in regards to Defense Counsel's alleged ineffective assistance, the State did receive the call from counsel and appreciated that. But the State posits that the record does affirmatively show that counsel was effective. For example, one of the, there's a big wording thing in these ineffective assistance claims. Counsel's arguing that defense counsel at trial never received a videotape memorializing his admission that he grabbed the gun after the truck blew his air horn. And maybe counsel didn't actually receive that DVD, but he was aware of what was on these DVDs. If you look at the State's brief on page 25, there's the trial transcript where defense counsel, after being asked about this video that the State's trying to introduce, she's intending to use a video. And then at the end of that paragraph, the video that she is intending to show begins when defendant is in the vehicle. The court says, in what vehicle? Defense counsel, in the police vehicle. Okay, and then defense counsel goes on in saying his objection will be based on foundation. He would like the jury to see the whole video, showing that he knows what's on all three different videos. He wants them to see the events leading up to the video. That would include the officer approaching the window of the vehicle with his handgun drawn, pointing at defendant from a close range. Defendant is fully cooperative, is placed in handcuffs, and then taken to the car. I think that sets the proper foundation for the portion of the video that the State would like to show the jury. So yes, counsel does state in his briefs that maybe defense counsel never received this video, and he does say in the post-trial motion that he didn't. But the fact remains that he was aware of what was on these videos, so the State struggles to see how that would lead to Moreover, defense counsel did object to this video. As I stated, he was aware of what was happening. And his strategy throughout trial varied on very different aspects. If you look at the closing argument he had, which is set forth on the State's brief on page 32, he put forth various theories, road raid of a semi-truck driver apparently trying to frame him. He attacked the witness's credibility, the State's witnesses. He also tried to state that defendant's confession was made under duress based on the police officer coming up to the car with his gun drawn. And another big factor was that he argued there was no evidence that the gun was loaded when defendant waved it. And I think that's an important point to note regarding his ineffective assistance claims. Because, yes, defendant did make an admission, which counsel was aware of, that he waved the gun. But the admission did not consist of him saying he waved the loaded gun, which the gun being loaded was an essential element of the aggravated unlawful use of the weapon. And if you look at the cross-examination of the officer in this case, the defense counsel was very cognizant of not asking questions regarding whether the defendant knew the gun was loaded when he waved it and other strategies such as that. Simply because the jury believed the State's witnesses over the defense counsel's did not mean that counsel's strategy was objectively unreasonable. In regards to the People's Exhibit 5, which is the affidavit of the notarized certification from a Firearms Service Bureau officer stating the defendant never applied to a concealed carry license, as Your Honor, Justice Steigman was stating, this was not an issue that was contested below. It would have been easily proven below. The fact that trial counsel just decided to not make it an issue was not an effective assistance of counsel because his strategy was, like I said previously, trying to argue the gun wasn't loaded when it was waved, or just trying to put reasonable doubt into the State's case. In regards to the fines and fees, the State's will rest on its brief, and if there's no further questions. Thank you, Your Honor. The State argues that there was no ineffective assistance of counsel because, in closing arguments, defense counsel argued road rage, witness credibility, that the defendant was under duress, and also that there was no evidence that the gun was loaded when he allegedly waved it at these people. The focus of this cross-examination, which was fairly intensive, had to do with the ability of the two people in the truck to see anything. Correct. But whether they saw the gun, Jeremy was ultimately, there was a directed verdict on the count of him waving the gun in a threatening manner. So there was a directed verdict as to that count. Regarding whether they could see the gun, it really becomes irrelevant if they can see the gun or not, if on the videotape Jeremy says, yes, I reached over after I got boxed in by the semi, grabbed my gun, and put it back. And that's one of the things that kind of confuses me about your argument in your brief. Your argument presumes that the defendant wouldn't have told his lawyer, they did take a taped statement from it, and I did mention that I had the gun, that this sort of suddenly, just sort of spontaneously appears at trial, and the defense attorney is caught off guard because this isn't something that his client would have been likely to tell him, and might have actually precipitated his decision not to testify. Well, you know, I've never been in a situation where I'm a criminal defendant. If I was, I would bestow upon my attorney the belief that he is a good attorney, he prepares for trial, he understands what the evidence is, and I think we give attorneys that presumption that they prepare for trial. It's kind of the base level of being effective. In this case, the record shows Counsel wasn't prepared for trial. He indicates no, and in fact, as the State noted in his post-trial motion, he explains that the video that they showed in court, he'd never seen, he'd never received it. He went through his file, it's not in his file, he talked to his partner, his partner didn't know anything about it. He apparently hadn't read the police report where Officer Hawley was... I have not seen any affidavit or anything. Not that I'm aware of, but I think it's a logical inference with the fact that Counsel is unsure what this video is, he's never seen it before when it's brought in by us. He's not unsure, he mentions to the judge that he wants, in fact, he wants the other video because of the doctrine of completeness. He wants to be able to show, he knows what the substance of the videos are. He says he wants that part in there where the officer approaches the vehicle with his gun drawn, because that's going to tie into his false confession based on the circumstances by the police. That's ineffectiveness of Counsel? It is, because as I referenced in the brief, a reading of the entire conversation that takes place there indicates that during a recess, Counsel had talked to the State, and that's when the State... You say that, but that is not in the record, Counsel. I respectfully disagree with you. There is nothing indicating that this is all being given to the defense by the State during some conference. No, I'm not... I somehow misread the transcript. I'm not saying that it was given to the defense Counsel. They end up taking a recess, and when they come back from the recess, that's when the defense Counsel says, she's planning on introducing this video, this is what it shows. He'd already said that before the recess. I'm sorry, I misremembered that. If I'm mistaken, I apologize. The exchange that I recall is that that was discussed with the State, and then when they come back from a recess, that's when the discussion takes place, that defense Counsel has then been notified that she plans to play the video. Then in the post-trial motion, Counsel notes that he'd never received that video. He talked to his partner. The partner had never seen the video, received the video. The comments at post-trial are far more egregious as far as Counsel's conduct than what takes place during the actual trial. But those comments evidence that defense Counsel hadn't seen this video before trial. I think it's one thing to watch a video, even if I'm wrong about it, and Counsel will watch that video during a recess. I don't think that's any less egregious. Because by that point, you've already set your defense up. You've already cross-examined these people trying to undermine their credibility. And that's not in the record, so we don't know that transpired. But as you said, we assume that he talked to his client and he prepared. Well, and I guess we assume as well that the client bestows upon his attorney a belief that the attorney's going to be prepared. And I would argue the record clearly doesn't show that to be the case. The only thing that we assume is things the lawyer doesn't do. We don't assume the things that he is likely to do. And I guess in some ways we have to do that, because as the appellant, I have to go by what's in the record. And if it's not in the record, I have to accept that it's not there. So I see my time has expired. Thank you, Counsel. We'd ask that the conviction be reversed, and I will be filing that supplemental brief sometime in the next week. Okay. Thank you, Counsel. Thank you.